UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT N.,[1] | ) |
| | ) No. 20 CV 1274 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Commissioner of Social Security, | ) |
| | ) October 25, 2022 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Robert N. again brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Before the court are cross motions for summary judgment. Robert contends that the ALJ's consideration of the psychological opinion evidence, residual functional capacity ("RFC") assessment, and subjective symptom analysis are not supported by substantial evidence. Because the ALJ failed to address the defects the court noted the last time Robert sought judicial review and for the additional reasons that follow, Robert's motion is granted, and the government's is denied:

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

## Procedural History

Robert filed his DIB and SSI applications in August 2012 alleging a disability onset date of October 30, 2011. (Administrative Record ("A.R.") 405-17.) After his application was denied, (id. at 98, 107, 120, 130), Robert sought and received a hearing before an administrative law judge ("ALJ") (id. at 195, 219). A hearing took place in June 2013 at which Robert provided testimony. (Id. at 62-89.) The ALJ found Robert not disabled, (id. at 132-45), and the Appeals Council remanded the case for further consideration, (id. at 150-53).

A second hearing before the same ALJ then took place in June 2015 at which Robert, a medical expert ("ME"), and a vocational expert ("VE") testified. (Id. at 15-61.) The ALJ again found Robert not disabled, (id. at 154-71), and this time the Appeals Council denied Robert's request for review, (id. at 1). Robert then filed a civil action for judicial review, and the court remanded the case for further proceedings. (Id. at 1447-57); *Robert N. v. Berryhill*, No. 17 CV 64, 2018 WL 3533273 (N.D. Ill. July 23, 2018) (Gilbert, M.J.). In the meantime, Robert filed a second DIB application, (A.R. 1577-86), and the Appeals Council consolidated the claims and assigned the remanded case to a different ALJ, (id. at 1475-79).

The newly assigned ALJ held a hearing in October 2018 at which Robert and a VE testified. (Id. at 1314-48.) She then issued a decision in January 2019 finding Robert not disabled. (Id. at 1279-1302.) When the Appeals Council denied Robert's request for review, (id. at 1271-78), the ALJ's denial became the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Robert

2

timely filed this lawsuit again seeking judicial review of the Commissioner's final decision, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 12).

## The Court's 2018 Decision

In its July 2018 decision, the court found that the ALJ erred in assessing Robert's subjective symptoms and his RFC. (A.R. 1451-56.) As relevant here, the court's analysis focused on the ALJ's error in "discounting [Robert's] testimony about his ability to walk just a half block before his knees become irritated." (Id. at 1452.) Robert testified that he used to go to the mall once or twice a month to get some exercise, and that he could walk about half a block before his pain would require him to sit down. (Id. at 36-37.) The ALJ noted that "with an estimated ability to only walk a half block, the claimant could not even get into the mall even considering his use of a handicapped parking permit," before concluding that Robert's "allegations of the half [block] walking limits are contradictory to his statements as he walks around the interior of the mall while stopping to rest or sit down numerous times." (Id. at 164.) The court was critical of this analysis, finding:

> [w]ithout knowing what mall Claimant frequents, where he parks, whether he sits down to rest after he enters the mall and before he continues walking inside the mall, and without any actual evidence in the record about any of these things, the ALJ's disbelief of Claimant's testimony in this regard is not supported by substantial evidence in the record.

(Id. at 1452-53.) The ALJ erred not only in "surmis[ing] that Claimant's testimony in this regard would be inconsistent with the ALJ's own assumptions," but also by ignoring ample evidence in the record that Robert "consistently reported issues with

3

prolonged walking." (Id. at 1453-54.) The court therefore directed the ALJ on remand to "re-evaluate Claimant's subjective symptom statements . . . with due regard to the full range of medical evidence." (Id. at 1455.)

## The ALJ's 2019 Decision

After the remand, the newly assigned ALJ followed the required five-step process in evaluating Robert's disability claim. *See* 20 C.F.R. § 404.5120(a). At steps one and two the ALJ found that Robert had not engaged in substantial gainful activity since his alleged disability onset date and that he suffers from the following severe impairments: obesity, spinal disorder, plantar fasciitis, peripheral neuropathy, diabetes mellitus, hypertension, and bipolar disorder. (A.R. 1284.) At step three the ALJ determined that Robert's impairments do not meet or medically equal any listed impairment. (Id. at 1287.) As part of this determination, the ALJ considered whether Robert's mental impairments satisfied either the "paragraph B" or "paragraph C" criteria for evaluating mental functioning. (Id. at 1288-90); *see also* 20 C.F.R. § 404.1520a; 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00A(2). As for the paragraph B criteria, the ALJ found that Robert has moderate limitations in interacting with others, but only mild limitations in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace ("CPP"), and adapting or managing oneself. (A.R. 1288-90.) As such, the ALJ concluded that Robert did not satisfy the paragraph B criteria. (Id.) The ALJ likewise found that Robert did not meet the paragraph C criteria. (Id.)

4

Before turning to step four, the ALJ determined that Robert has the RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except lift and carry 20 pounds occasionally, 10 pounds frequently, never climb ladders, ropes or scaffolding and no more than occasionally climb ramps and stairs, balance, stoop, crouch, kneel, crawl, bend or twist; be allowed a sit-stand option letting claimant stand for 1-2 minutes after sitting for 60 minutes; be allowed to use a cane as needed to get to and from the work station; no public contact and no more than occasional contact with coworkers and supervisors; and no teamwork situations (not required to work with others to complete the same job task(s)) but can work independently.

(Id. at 1291.) In determining these limitations, the ALJ evaluated Robert's symptom allegations and concluded that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Id. at 1292.) As part of this assessment—and just like the first ALJ had done—the ALJ discussed Robert's attempts to exercise at the mall, noting that "with an estimated ability to only walk a half block, the claimant could not even get into the mall even considering his use of a handicapped parking permit," before concluding that Robert's "allegations of the half block walking limits are contradictory to his statements as he walks around the interior of the mall while stopping to rest or sit down numerous times." (Id. at 1291.)

In formulating the RFC, the ALJ considered the psychological opinion evidence. The ALJ gave "very little weight" to psychiatrist Dr. Mark Amdur's 2018 opinions, crediting only his description of Robert's "alleged problems with others" as being consistent with the record. (Id. at 1300.) The ALJ justified discounting Dr. Amdur's opinions based on credibility concerns. She concluded that conducting

5

the examination in Robert's lawyers' office gave her "the appearance that Dr. Amdur is part of the attorney firm/practice and/or staff"—not an independent medical professional—and that Robert's report of a special education history during the examination showed that Robert "may not have been forthcoming with Dr. Amdur." (Id.) The ALJ believed that "the record does not show [Robert] having a learning disorder causing more than mild restrictions." (Id.) The ALJ also rejected Dr. Amdur's report because of alleged inconsistencies, including the following: he diagnosed Robert with a learning disorder but "indicate[d] [Robert] can handle funds"; he opined Robert would have "poor quali[t]y performance" but failed to explain how Robert could commute alone on public transportation to the examination; he found Robert to be "a poor historian" and unable to "provide information such as the name of the current mayor or any recent new[s] event," but at the hearing Robert was "very clear and detailed about his complaints and treatment"; and he failed to define stress or slow performance "in terms consistent with SSA criteria." (Id.) The ALJ then found at step four that Robert is unable to perform any past relevant work but concluded at step five that he was not disabled because he can perform a significant number of jobs in the national economy. (Id. at 1300-02.)

## Analysis

Robert argues that the ALJ erred by rejecting Dr. Amdur's opinions, failing to account for all of his severe impairments in the RFC, and discounting his symptom allegations based upon alleged inconsistencies "mischaracterized as such, without

support from the evidence." (R. 20, Pl.'s Br. at 5-6.) In reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted).

That said, because the court has already issued a ruling in this case, the law of the case doctrine applies here. *See Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991); *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) ("The law of the case doctrine . . . is applicable to judicial review of administrative decisions."). The doctrine requires that "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key*, 925 F.2d at 1060. "This consistency protects parties from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* (internal quotations and citations omitted). Exceptions to the law of the case doctrine may arise when substantial new evidence

7

is introduced after judicial review, or the reviewing court is convinced that the decision of the first was clearly erroneous. *Id.* (citations omitted).

## A. Symptom Assessment

Robert argues that the ALJ improperly discounted his symptom allegations "on the basis of suppositions, potential inconsistencies that she did not seek to resolve, and evidence that she mischaracterized." (R. 20, Pl.'s Br. at 15.) An ALJ's symptom evaluation is entitled to great deference because of the ALJ's ability to observe firsthand the believability of the claimant's symptom descriptions. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a reviewing court may reverse a symptom assessment only where it is "patently wrong." *Id.* at 816. The court will not disturb an ALJ's evaluation of a claimant's symptom description if it is logically based on specific findings and evidence in the record. *See id.* at 815; *see also Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014) ("[T]he ALJ must . . . explain [her] analysis of the evidence with enough detail and clarity to permit meaningful appellate review."). "[A]lthough ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to [her] ruling." *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022).

Here, the ALJ violated the law of the case doctrine by ignoring the court's 2018 decision when reviewing the case on remand. In that decision, the court explained that discounting Robert's testimony regarding his difficulties walking constituted reversible error because: (1) the ALJ's analysis was based on alleged inconsistencies with unfounded assumptions; and (2) the ALJ failed to consider evidence consistently documenting Robert's issues with prolonged walking.

8

(A.R. 1452-54.) Nonetheless, the newly assigned ALJ repeated word for word the first ALJ's improper analysis of Robert's walking difficulties. (See id. at 164, 1291.) Furthermore, even though the court directed the ALJ to "evaluate [Robert's] symptom statements . . . with due regard to the full range of medical evidence," the ALJ did not consider the record evidence that supports Robert's complaints of difficulty walking. (See id. at 1279-1302, 1454.) Such flawed analysis made the first ALJ's symptom assessment patently wrong, and—having been adopted wholesale by the newly assigned ALJ—the same is true for the symptom assessment presently before this court. *See Key*, 925 F.2d at 1060.

Making these errors more egregious is the fact that the evidence demonstrating Robert's pain and resulting difficulties walking only continued to accumulate between the June 2015 hearing and the October 2018 hearing. During this time Robert continued to complain of back, knee, and leg pain to his doctors. (See A.R. 1834, 1849-52, 1873-75, 1878-79, 1881-83, 1888, 1894, 1915, 1927, 1963, 2027, 2043, 2077, 2082.) Likewise, function and disability reports submitted during this period highlight Robert's pain and difficulties walking. (Id. at 1686-92, 1698, 1714.) And Robert's primary care physician, Dr. Christopher Flinn, certified on a July 2018 application for a handicapped parking placard that Robert "is severely limited in the ability to walk due to an arthritic, neurological, oncological or orthopedic condition," and that Robert "cannot walk 200 feet without stopping to rest" because of his condition. (Id. at 2118.)

Also, doctors who examined Robert during this period observed his apparent pain and difficulty walking. In Dr. Amdur's 2018 psychiatric evaluation of Robert, he noted that Robert needed to stand up twice during their 95-minute examination and described this behavior as "frequently manifested by persons with back pain." (Id. at 1930.) And in a 2017 internal medicine consultative examination, Dr. Dilip Patel observed the following: "moderate stiffness, mild-to-moderate pain, mild synovial thickening, and reduced range of movement" in both of Robert's knees; "unsteady [gait] without cane due to fear of knees giving out"; inability to "heel toe walk," "squat and arise," or "walk 50 [feet] safely without a cane"; and "osteoarthritis with suspected internal derangement of both knees." (Id. at 1757-62.)

The ALJ failed to discuss almost all of this evidence, briefly mentioning only Dr. Patel's report and the parking application. While the ALJ noted Dr. Patel's observation that Robert used a cane, she did not engage with Dr. Patel's other findings regarding Robert's pain and difficulty walking. (Id. at 1294.) Additionally, the ALJ cited the parking application Dr. Flinn signed to claim that "[Robert's] limitation in his ability to walk distances was given consideration in the RFC to limit him to sedentary work." (Id. at 1300.) However, the limits certified in the parking placard are fully consistent with Robert's claim of having the ability to walk only about half a block before needing to rest—and endorsing the one while discounting the other is entirely contradictory. As the ALJ offers no further explanation and does not engage with any of the other oft-repeated evidence in the

10

record of back, knee, and leg pain that makes walking difficult for Robert, the court is left to guess how much credit the ALJ actually gave to such symptom allegations. The lack of a coherent record showing how the ALJ assessed these complaints stymies the court's ability to review the ALJ's disability determination.

The symptom assessment is therefore patently wrong for two reasons independent of the law of the case doctrine. First, the ALJ's failure to engage with an entire line of evidence—here, all the documentation corroborating Robert's reports of pain and difficulty walking that has accumulated since the 2015 hearing—constitutes reversible error. *See Grotts*, 27 F.4th at 1278; *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (ALJs have "a basic obligation to develop a full and fair record" and "remand may be required . . . if the ALJ based the decision on serious factual mistakes or omissions."). Second, the ALJ's contradictory dismissal of Robert's allegations that he can only walk a half-block while crediting substantially identical limits in the parking application makes the symptom assessment "so ambiguous that it frustrates judicial review," and therefore "it cannot be upheld." *Poole*, 28 F.4th at 796. The court cannot treat these errors as harmless because Robert has long alleged impaired mobility stemming from back, leg, and knee pain as one of his primary bases for claiming disability, (see, e.g., id. at 87, 90, 1407, 1755), and fully crediting his symptom allegations may lead the ALJ to assess greater limitations than to sedentary work—which may require up to two hours of walking, *see* 20 C.F.R. § 404.1567(a); *Poole v. Kijakazi*, 28 F.4th 792, 796

11

(7th Cir. 2022) ("'[S]edentary' jobs may involve . . . no more than two hours of standing or walking per day.").

Finally, although Robert makes largely cursory arguments that the ALJ erred in her discussion of his refusal to get insulin shots, ability to bend, poor compliance with mental health treatment, reluctance to pursue work, and activities of daily living, (R. 20, Pl.'s Br. at 14-15), any error committed by the ALJ in these analyses is not enough on its own to render her symptom analysis patently wrong. (See R. 29, Govt.'s Resp. at 12-15); *see also Halsell v. Astrue*, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as *enough* of them are.") (emphasis in original). That said, the ALJ's opinion does little to reflect how Robert's condition, treatment, and compliance with treatment has changed over the many years since he first applied for benefits. The relevant regulations require the ALJ to consider both the duration of symptoms and course of treatment, *see* 20 C.F.R. § 404.1529(c)(3), and the Seventh Circuit has emphasized that failure to properly consider "significant, new, and potentially decisive findings" could constitute error, *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). Therefore, the ALJ on remand should evaluate Robert's reported symptoms in light of the full history of his conditions and treatment reflected in the record, and not unduly discount his allegations based upon outdated evidence or unsupported assumptions.

**B.     Dr. Amdur's Opinions**

Robert says that the ALJ erred by rejecting Dr. Amdur's opinions and that proper consideration of the same would point to a moderate CPP limitation instead

of the mild limitation the ALJ found. (R. 20, Pl.'s Br. at 6-11.) An ALJ must consider various factors when weighing medical opinions, including: the length, nature, and extent of the examining and treatment relationship; the supportability of the medical source's opinion; the consistency of the opinion with the record; and the source's specialization. 20 C.F.R. § 404.1527(c); *see also Ephrain S. v. Berryhill*, 355 F. Supp. 3d 738, 746 (N.D. Ill. Feb. 21, 2019). In so doing, the ALJ "must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do," and adequately explain why she weighed an opinion in a particular way and in light of that record. *Murphy v. Astrue*, 454 Fed. Appx. 514, 518 (7th Cir. 2012) (quotations and citations omitted); *see also* 20 C.F.R. § 404.1527(b); *Reinaas v. Saul*, 953 F.3d 461, 465 (7th Cir. 2020). Additionally, the ALJ "must not succumb to the temptation to play doctor and make [her] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Here, the ALJ afforded "[v]ery little weight" to the opinions of Dr. Amdur because she questioned his credibility and found inconsistencies in his report. (A.R. 1300.) However, the ALJ's reasons for discounting Dr. Amdur's report lack record support and are based on her own assumptions rather than evidence. As for Dr. Amdur's credibility, the ALJ expressed skepticism because the examination in Robert's lawyer's office "gives the appearance that Dr. Amdur is part of the attorney firm/practice and/or staff." (Id.) But while the nature and purpose of a medical relationship can inform the ALJ's assessment of an examining physician, the fact

13

that a disability claimant seeks out a doctor's opinion to support his or her disability case cannot by itself justify discounting that doctor's opinion. *See Reinaas*, 953 F.3d at 466 ("the mere fact that a medical opinion has been solicited to support a disability application is not a sufficient reason to ignore it."). In other words, although the ALJ may find that Dr. Amdur lacks credibility because she perceives him as a hired gun, the ALJ must still support that finding with other indications of unreliability before it can qualify as a valid basis for discounting Dr. Amdur's opinions. Performing an examination in an attorney's office could provide such an indication by conveying a lack of independent rigor or neutrality. Here, however, the evidence suggests Robert consented to that location after declining to be evaluated at his home, (id. at 1751), the ALJ asked Robert no clarifying questions during the hearing about why the exam took place at that location, (see id. at 1316-48), and the ALJ has not identified any ways in which using that location skewed Dr. Amdur's methodology or results, (id. at 1300). As a result, all the record indicates about the examination location is that it was a second choice to Robert's home. Absent some record evidence calling Dr. Amdur's credibility into question, the ALJ has not supported her concerns.

The ALJ further questioned the reliability of Dr. Amdur's opinion because, in her view, Robert's report of a special education history during the examination showed Robert "may not have been forthcoming with Dr. Amdur." (Id.) The ALJ certainly may consider that Robert denied receiving special education services in his 2010 and 2012 disability reports, (see A.R. 481, 948), and then later asserting that

14

he received such services, (see, e.g., A.R. 88, 948). Here, however, the ALJ decided to credit Robert's reports of a special education history. (A.R. 1286.) Having done so, it is contradictory for the ALJ to then treat Robert's report of that history to Dr. Amdur as evidence that Robert was less than fully honest during the examination— or to discount Dr. Amdur's findings as a result. Given these errors, the ALJ's analysis of Dr. Amdur's credibility lacks the support of substantial evidence. *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016) (substantial evidence standard "not satisfied unless the ALJ has adequately supported [her] conclusions.").

The ALJ's logic concerning inconsistencies between Dr. Amdur's report and other record evidence similarly lacks merit. The ALJ cited no medical evidence to support her concerns about Robert's ability to handle funds, ride public transportation to the evaluation, or recall his medical history but not current events. Instead, the ALJ appears to have found Dr. Amdur's findings inconsistent with her own assumptions about how someone with Robert's mental limitations would function. As such, the ALJ impermissibly substituted her judgment for that of a trained psychiatrist. S*ee Rohan*, 98 F.3d at 970.

Furthermore, the ALJ expressed concerns about Dr. Amdur's description of Robert as a "poor historian" and Dr. Amdur's failure to define Robert's learning disorder "in terms consistent with SSA criteria." (A.R. 1300.) But Dr. Amdur explained the "poor historian" descriptor by pointing out that Robert "spoke rapidly and was over spontaneous," (id. at 1929), before adding that Robert was "sometimes difficult to follow . . . because he tended to talk without prompting and not obey

15

normal conversational pauses," (id. at 1933). Dr. Amdur never described Robert as struggling to recall or relate his health details and complaints, yet the ALJ treated the report as if it describes such difficulties. Similarly, as for the learning disorder, Dr. Amdur diagnosed Robert with "significant cognitive impairments" that are "best labeled as learning disorders" after administering the Montreal Cognitive Assessment. (Id.) Robert scored a 16 out of 30 on that assessment, "performed particularly poorly on the tests of visuospatial and executive functioning," and overall "performed quite slowly." (Id.) These observations led Dr. Amdur to conclude that Robert's learning disorders "predict slow performance and poor quality performance." (Id.) Thus, while Dr. Amdur may not have defined some terms to the ALJ's liking, his report includes information that the ALJ should not have ignored. *See Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (ALJ may not engage in "impermissible cherry-picking" by "highlighting facts that support a finding of non-disability while ignoring evidence to the contrary").

Finally, the ALJ's complaint that "the record does not show [Robert] having a learning disorder causing more than mild restrictions," (A.R. 1300), does not identify any inconsistency because Dr. Amdur offers no opinion as to how Robert's limitations would translate in terms of the paragraph B criteria, (see id. at 1929-33). As the ALJ points to no evidence in the medical record contradicting Dr. Amdur's findings, the court cannot guess at whatever inconsistency the ALJ intended to cite. *See Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018) ("[T]he ALJ's decision cannot be defended on a basis not articulated in her order."). Nor

16

can the ALJ reject Dr. Amdur's findings simply because they challenge her paragraph B conclusions. The ALJ must grapple with confounding evidence and take Robert's longitudinal history into account when considering the paragraph B criteria, and she may not simply disregard evidence favorable to the applicant. *See* 20 C.F.R. § 404.1520a(c)(1) (use of the "special technique" requires ALJ to consider "all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation"); *Martin*, 950 F.3d at 375.

Because the ALJ failed to support her rejection of Dr. Amdur's opinions with substantial evidence, she must reevaluate them on remand. In so doing, the ALJ should take care to consider the required regulatory factors, *see* 20 C.F.R. § 404.1527(c), and adequately explain how the record—and not her own assumptions—supports her conclusions.

**C.    RFC Assessment**

Finally, Robert argues that the ALJ's RFC is incomplete because it fails to take into account Robert's peripheral neuropathy, obesity, and hand tremors, and that the ALJ failed to support her findings that Robert could walk up to two hours per day and would only need to stand for one to two minutes after sitting for an hour. (R. 20, Pl.'s Br. at 11-13.) The RFC measures the maximum a person can do despite his limitations and must be based upon "all the relevant evidence" in the record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). However, a flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included in the RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Jozefyk*, 923 F.3d at 498.

17

Robert has not identified any additional limitations beyond those already assessed in the RFC, (see R. 20, Pl.'s Br. at 11-14), so his arguments cannot justify reversal on this ground. Furthermore, given Robert's other contentions here, he should be able to identify what other restrictions the ALJ should have included in the RFC. The burden of proof remains with Robert through step four. *See, e.g., Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). As such, he should have taken more care to explain how the errors he alleges the ALJ made at earlier stages of the review process affected the limitations the RFC should also include, rather than leaving it up to the court to infer the impact of his arguments. That said, because this court remands the matter for a reevaluation of Robert's symptom allegations and Dr. Amdur's report, the ALJ may need to reexamine Robert's RFC.

## Conclusion

For the foregoing reasons, Robert's motion is granted, the government's is denied, and the case is remanded for further proceedings consistent with this opinion.

        **ENTER:**

        _____
        **Young B. Kim**
        **United States Magistrate Judge**